Case 1:24-mj-00272-GMH Docume

Case: 1:24-mj-00272
Assigned To : Judge G. Michael Harvey
Assign. Date : 8/23/2024
Description: COMPLAINT W/ARREST WARRANT

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Rory Marquette, being duly sworn, depose and state as follows:

### I. INTRODUCTION AND SUMMARY OF PROBABLE CAUSE

1. I make this affidavit in support of a criminal complaint charging **Bence Horvath** ("**HORVATH**") with knowingly and willfully conspiring to export U.S.-origin radio communication technology from the United States to Russia, in violation of the Export Control Reform Act (50 U.S.C. § 4819). As set forth in greater detail below, there is probable cause to believe that the illegal activity in support of these offenses occurred from at least in or about January 2023 until in or around May 2023.

2. The facts set forth in this affidavit are based on information that I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, on documents that I have reviewed, and on my training and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint does not set forth all of my knowledge about this matter.

### II. AGENT BACKGROUND

4. I am a Special Agent with U.S. Department of Homeland Security, Homeland Security Investigations (herein referred to as HSI) currently assigned to the New Orleans, LA office. I have been employed as such since May 2003. In connection with my current official law enforcement duties, I investigate criminal violations, including Titles 18 and 50 of the United States Code. As a part of my official duties, I have directed and/or participated in criminal investigations involving the smuggling of export-controlled equipment, illegal transfer of sensitive

technology, the smuggling or export of other illicit merchandise, and various financial violations, including money laundering. I am familiar with the laws and facts underlying prosecutions of the Export Control Reform Act.

5. I am one of the case agents in this investigation. The information obtained over the course of the investigation has revealed that **HORVATH**, together with known and unknown coconspirators, has conspired to violate 50 U.S.C. § 4819. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

### III.    STATUTORY VIOLATIONS

#### A.    Export Control Reform Act

6. On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which includes the Export Control Reform Act of 2018 ("ECRA"). ECRA provides that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811. To that end, ECRA grants the President the authority to control "the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons." 50 U.S.C. § 4812(a)(1). ECRA further grants the Secretary of Commerce the authority to establish the applicable regulatory framework.

7. Pursuant to that authority, the Department of Commerce reviews and controls the export of certain items, including commodities, software, and technology, from the United States to foreign countries through the Export Administration Regulations ("EAR"). 15 C.F.R. parts 730-774. In particular, the EAR restricts the export of items that could contribute to the

military potential of other nations or that could be detrimental to United States foreign policy or national security. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.

8. The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL"), 15 C.F.R. Part 774, Supp. No. 1, and are categorized by Export Control Classification Numbers ("ECCN"), each of which has export control requirements depending on the destination, end use, and end user.

9. Under 50 U.S.C. § 4819(a)(1), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of this subchapter or of any regulation, order, license, or other authorization issued under this subchapter, including any of the unlawful acts described in paragraph (2)." Such unlawful acts include, among other acts, that "[n]o person may engage in any conduct prohibited by or contrary to, or refrain from engaging in any conduct required by this subchapter, the [EAR], or any order, license or authorization issued thereunder." 50 U.S.C. § 4819(a)(2)(A). A person who willfully commits, attempts to commit, or aids and abets these offenses is guilty of a federal crime punishable up to a $1,000,000 fine and 20 years' imprisonment. 50 U.S.C. § 4819(b).

10. On February 24, 2022, in response to the Russian Federation's unprovoked full-scale invasion of Ukraine, the U.S. Department of Commerce imposed new license requirements on exports and reexports to Russia. As of February 24, 2022, any item classified under any ECCN in Categories 3 through 9 of the CCL requires a license to be exported to Russia. *See* 87 Fed. Reg. 12,226 (Mar. 3, 2022). As of April 8, 2022, all items on the CCL required a license for export to Russia. *See* 87 Fed. Reg. 22,130 (Apr. 14, 2022).

## VENUE

11. Acts and omissions in furtherance of the offenses alleged herein occurred within the District of Columbia, namely the failure to obtain a license from the Department of Commerce in furtherance of the offenses referenced herein. *See* 50 U.S.C. § 4819.

## FACTS SUPPORTING PROBABLE CAUSE

12. This complaint arises from an illicit scheme by entities and individuals to export and attempt to export U.S.-origin technology, *to wit*, radios and associated hardware and equipment manufactured by an unwitting U.S. telecommunications company ("U.S. Company 1"), from the United States to Russia, including for use by Russian government end users, beginning in or around January 2023 until in or around May 2023.

### A. Background on the Co-Conspirators and Relevant Entities

13. RUSSIAN COMPANY 1 is run by CO-CONSPIRATOR 1, **HORVATH**'s relative and business associate. Your affiant has reviewed evidence during the course of the investigation showing that **HORVATH** is intimately involved with RUSSIAN COMPANY 1's efforts to illegally procure U.S. Company 1's mobile communications devices for end use in Russia.

14. The investigation has also revealed that **HORVATH** participated in a wider scheme to secure goods, including controlled U.S.-origin goods, for the benefit of RUSSIAN COMPANY 1, RUSSIAN COMPANY 2, and other Russian end users, using front companies **HORVATH** controlled in Spain ("SPANISH COMPANY 1"), Serbia ("SERBIAN COMPANY 1"), and Hungary ("HUNGARIAN COMPANY 1"). The investigation to date has revealed no evidence that **HORVATH** ever sought to export materials to end users in any country other than Russia.

15. **HORVATH** and his co-conspirators laid out the scheme in an email chain from in or around May 2023, in which **HORVATH** explained that to "accelerate [the procurement] process" the co-conspirators would sell radios manufactured by U.S. Company 1 to "a Spanish company," *i.e.*, SPANISH COMPANY 1. **HORVATH**'s co-conspirator responded that they had received a shipment of U.S. Company 1 radios, and that **HORVATH** could pick them from a warehouse in Hungary. Another co-conspirator then explained that "the Spanish company[, *i.e.,* SPANISH COMPANY 1] has to sell to [HUNGARIAN COMPANY 1]," which would then sell the goods to yet another front company, SERBIAN COMPANY 1. The co-conspirator summarized the scheme: "The[n] most important, that when the goods leaves [sic] the country it comes from [HUNGARIAN COMPANY 1], goes to Serbia, enters the country, to [SERBIAN COMPANY 1] and after that to [RUSSIAN COMPANY 2] in Moscow."

16. Your affiant has also conducted independent open-source research on RUSSIAN COMPANY 1, which is based in Moscow, Russia and publicly identifies itself as a channel partner for U.S. Company 1, a designer, manufacturer, and seller of communications equipment, including radios. An open-source website operated by the Ukrainian government lists entities that the Ukrainian government believes to be providing support to Russian efforts in the invasion of Ukraine. The website indicates that RUSSIAN COMPANY 1 is "[a] Russian company that works in the interests of the Russian Ministry of Defense and supplies radio communications that were used by Russia during the illegal invasion of Ukraine in 2022." Further examination of the Russian Taxpayer Identification Number ("TIN") and State Registration Number ("SRN") listed on this site for RUSSIAN COMPANY 1 match the TIN and SRN for RUSSIAN COMPANY 1 found on corporate data sites.

17. **HORVATH** and CO-CONSPIRATOR 1 also control or operate a number of other

companies that are affiliated with or are cut-outs for RUSSIAN COMPANY 1. Among these other companies are RUSSIAN COMPANY 2 (which directly contracts with Russian government entities), SERBIAN COMPANY 1 (which **HORVATH** and his co-conspirators use for transshipment of goods to Russia), and HUNGARIAN COMPANY 1 (a telecommunications company based in Hungary). RUSSIAN COMPANY 1 and RUSSIAN COMPANY 2 share the same Moscow, Russia address and phone number, and email signatures for **HORVATH** identify him as the Deputy Director of RUSSIAN COMPANY 2.

18. As noted above, RUSSIAN COMPANY 2 directly contracts with Russian government entities. Employees for RUSSIAN COMPANY 2 have communicated with or contracted with several Russian government entities about U.S. Company 1 radios and communications infrastructure, including the Ministry of Internal Affairs and the Department of Regional Security and the Ministry of Finance for the Nizhny Novgorod Region of Russia. In addition, communications and other business documents detail RUSSIAN COMPANY 2's work in the construction of "operational radio communication system in the Kursk region," which is located along the Russia/Ukraine border.

19. In particular, one document outlined the construction efforts by RUSSIAN COMPANY 2 in the Kursk region to build communications infrastructure. The document contained a satellite image of the Kursk region along the Ukraine border with yellow "pins" dropped at various geographical locations. The document further highlighted specific types of radio repeater antennas to be placed in the area along with temporary manned transmission and monitoring stations.

B. **Business with U.S. PERSON 1**

20. Beginning in or around January 2023, **HORVATH**, CO-CONSPIRATOR 1, and

the Corporate Director of a Latvian freight forwarding company ("CO-CONSPIRATOR 2") began discussing with the president of a small U.S. radio distribution company ("U.S. PERSON 1") a series of transactions that involved procuring and exporting U.S. Company 1's radios and radio accessories (*e.g.*, radio batteries, multiunit radio charging stations, and microphones), from the United States and elsewhere to Russia via third countries, including Latvia and the United Arab Emirates. U.S. Company 1 is a large U.S. manufacturer of radios and other products, and is distinct from the small radio distribution company operated by U.S. PERSON 1. Some of these items were controlled for export and reexport to Russia, as described below.

21. For example, on or about January 31, 2023, **HORVATH** emailed CO-CONSPIRATOR 2 with the subject line "Shipping from Dubai / Moscow." The body of the email stated, "The goods are in Dubai inside Free Trade Zone and we would like to buy it for [SERBIAN COMPANY 1], the Serbian company. After that, we would like to sell it to [RUSSIAN COMPANY 2] and ship to Moscow." This email attached a sales order from U.S. PERSON 1 listing radios manufactured by U.S. Company 1.

22. Beginning in or around March 2023, **HORVATH** continued discussions with U.S. PERSON 1 via email regarding the acquisition of U.S. Company 1 radios and accessories for export from the United States, ultimately to Russia and Russian end users.

23. On or around March 24, 2023, U.S. PERSON 1 emailed **HORVATH** about end-user information for certain U.S. Company 1 radios, stating, "OK, I need to know End User country for [specific U.S. Company 1 radios]. IF [U.S. Company 1] quotes, the end user will need to complete that form."

24. Later that same day, **HORVATH** responded to U.S. PERSON 1, saying, "Will ask and get back to you. If they don't provide, I will tell them they cannot do it without."

7

25. Still later that same day, U.S. PERSON 1 responded to **HORVATH**, saying, "Those are US Export LAWS, its [*sic*] not like they have a choice. They either comply or there are no radios."

26. Following the exchange of several more emails, on or around March 29, 2023, **HORVATH** wrote to U.S. PERSON 1, asking, "Equipment goes to Moscow for public safety use. The end user is the Moscow Police. I just realized that this equipment is actually not sanctioned, it's only [U.S. Company 1] that decided to leave the market. Do you think we can still buy this stuff, or we give up?"

27. That same day, U.S. PERSON 1 responded, "No Chance [*sic*] [.]"[1] Neither of the orders discussed in the January 2023 email or the March 24-29, 2023 emails recounted above were consummated, based on a review of available information to date.

28. On or around March 27, 2023, U.S. PERSON 1 emailed **HORVATH**, asking, "[**HORVATH**] on your list that you wanted to order at the end of the month you had 10 [U.S. Company 1 radios]. I have these in stock, do you still need them?? [signed U.S. PERSON 1]."

29. Further emails between **HORVATH** and U.S. PERSON 1 discussed basic pricing and availability, with U.S. PERSON 1 confirming availability of the relevant radios as well as some of the accessories. During these exchanges, U.S. PERSON 1 asked **HORVATH** where the radios would be going so as to give a freight estimate, to which **HORVATH** replied that the goods would be shipped to Madrid, Spain.

30. On or around March 30, 2023, U.S. PERSON 1 received a further reply from

---

[1] The email exchange included in paragraphs 21-25 concerned an order of U.S. Company 1 radios that was separate from the order detained on export in Miami, Florida, and discussed in the following paragraphs.

**HORVATH**, stating, "Hi [U.S. PERSON 1], We could potentially order this our self, but cannot confirm until later tonight. Please stand by! Thanks." HORVATH then followed up: They are now answering, but give me 30 minutes and I will confirm the purchase of the DP Radios myself." He then included the model numbers he was interested in purchasing as the DP4401e, the DP4400e, and the DP4600e.

31. Later that day, **HORVATH** sent a follow-up note to U.S. PERSON 1, stating, "Hi [U.S. PERSON 1], Will buy these! Will send all the info tomorrow for the invoice."

32. On or around March 31, 2023, **HORVATH** sent U.S. PERSON 1 the buyer and shipping information for the shipment of U.S. Company 1 radios, listing the "bill to" SPANISH COMPANY 1 and listing the shipping address as a freight forwarder located in Riga, Latvia and operated by CO-CONSPIRATOR 2.

33. On April 1, 2023, U.S. PERSON 1 advised **HORVATH** that the "[p]ower supply, compact mic[rophone], and RSM [remote speaker microphone] will come from Europe. Radios from South Africa. Chargers and batteries from USA."

34. Later that same day, **HORVATH** responded, "Do you think we can try to ship that radios strait [*sic*] to Moscow? SA [South Africa] does not follow sanctions?" U.S. PERSON 1 did not respond to this message.

35. On or around April 2, 2023, U.S. PERSON 1 sent **HORVATH** a new email that included three separate sales orders for a variety of U.S. Company 1 radios and associated accessories. All of the sales orders list the "bill to" address as SPANISH COMPANY 1 and the "ship to" address as the freight forwarder located in Riga, Latvia and operated by CO-CONSPIRATOR 2. One of the sales orders, Sales Order 25513, was for 170 units of three types of U.S. Company 1 radios, the DP4401e, the DP4400e, and the DP4600e, in addition to related

9

accessories. Those were the same three types of U.S. Company 1 radios that **HORVATH** listed in his March 30, 2023 email, and subsequently asked U.S. PERSON 1 if they could be shipped directly from South Africa to Moscow.

36. The total cost for Sales Order 25513 was $84,530.

37. The specific radios that **HORVATH** ordered are controlled under Export Control Classification Number (ECCN) 5A992.c for anti-terrorism purposes. U.S. Company 1 advertises the radios as submersible up to 1 meter for up to 30 minutes, and that they have a "rugged design," and meet military specifications 810C, 810D, 810E, 810F, 810G. This indicates that the radios meet the standard for Department of Defense use in reaction to high and low temperature environments, solar radiation, rain, vibration and shock.

38. On or around April 3, 2023, **HORVATH** replied to U.S. PERSON 1's email, stating, "Hi [U.S. PERSON 1], I need your banking details for the transfer, it is not on the Sales Order. Thanks [signed **HORVATH**]."

39. U.S. PERSON 1 replied with a Word document that contained specific banking details for U.S. PERSON 1's relevant bank accounts, including account information and SWIFT information for international wire transfers.

40. On or around April 24, 2023, a business owned by U.S. PERSON 1 received an international wire from SPANISH COMPANY 1 in the amount of $97,664.

41. On or around May 10, 2023, officers from U.S. Customs and Border Protection ("CBP") notified HSI that a shipment was scheduled to be exported from the United States on May 12, 2023. The Electronic Export Information ("EEI") associated with the export and filed by the U.S. freight forwarder ("USFF") on May 10 listed the U.S. Principal Party of Interest as a business owned by U.S. PERSON 1 and the Ultimate Consignee as the freight forwarder located in Riga,

Latvia and operated by CO-CONSPIRATOR 2. Russia was not mentioned on the EEI. This shipment was scheduled for export from Miami International Airport via a Turkish airline. The description of commodities was listed as Transceivers, Harmonized Tariff Schedule 8525601035 (Radio Transceivers, Hand-Held), No License Required. The Exporter point of contact was listed as U.S. PERSON 1. As a result of this information, investigators requested that this shipment be detained for further inspection.

42. On or around May 11, 2023, CBP provided HSI with copies of all available documents for the shipment. Included in these documents was an air waybill issued by the Turkish airline, which also listed the shipper as a business owned by U.S. PERSON 1 and the Ultimate Consignee as the freight forwarder located in Riga, Latvia and operated by CO-CONSPIRATOR 2. The waybill's handling information stated in part, "Please notify CNEE (Consignee) upon arrival 37129179397 [CO-CONSPIRATOR 2]." The items in the shipment were described as telecommunication equipment.

43. Also enclosed with these documents was an invoice issued by a business owned by U.S. PERSON 1 – with invoice number 25513-1 – dated April 28, 2023, billed to SPANISH COMPANY 1 and shipped to the freight forwarder located in Riga, Latvia and operated by CO-CONSPIRATOR 2. This invoice was almost identical to the Sales Order 25513 document that U.S. PERSON 1 sent to **HORVATH**, with the exception that one of the listed U.S. Company 1 radios was for a larger quantity, bringing the total order to 200 units. The amount of this invoice was listed as $97,664, which matches the wire amount received from Spain on April 24, 2023.

44. On May 15, 2023, HSI communicated with CBP officers at the Port of Miami involved with the detention. CBP confirmed that this shipment contained radios along with other accessories. Officers provided HSI with pictures from the detention to confirm these findings.

45. On June 1, 2023, the USFF filed a "corrected" EEI, this time identifying the items as classified under ECCN 5A991.

46. On or around June 8, 2023, agents with HSI and the Department of Commerce conducted an End-Use Check in Riga, Latvia related to the detained shipment. As part of this End-Use Check, agents interviewed the purported Ultimate Consignee of the shipment, CO-CONSPIRATOR 2, the listed point of contact for the freight forwarder located in Riga, Latvia, per the shipping and export documents. CO-CONSPIRATOR 2 told the agents that s/he was not the end user of the shipment and that s/he is only a freight forwarder who arranges for the freight to be forwarded. In CO-CONSPIRATOR 2's case, s/he pays trucking companies to move the freight, as s/he does not own trucking assets.

47. Phone records show that CO-CONSPIRATOR 2 was in regular and frequent communication with CO-CONSPIRATOR 1 in the days immediately before the export of the radios and in the days immediately before and after the HSI/Department of Commerce End-Use Check. These phone records further showed that CO-CONSPIRATOR 1 was in communication with U.S. PERSON 1 in the days after the detention and the End-Use Check.

48. On or around June 22, 2023, CBP seized the detained shipment of U.S. Company 1 radios and associated accessories for violations of U.S. laws. U.S. PERSON 1 abandoned the detained shipment to CBP on July 17, 2023.

C. **Department of Commerce License Determination**

49. A Department of Commerce License Determination concluded that the three types of U.S. Company 1 radios that HORVATH indicated interest in in his March 30, 2023 email and then purchased with Sales Order 25513-1 and that were later in the shipment described above are subject to the EAR and classified under ECCN 5A992.c for anti-terrorism purposes, and that on

May 12, 2023, the date of the attempted export, such items required a Department of Commerce export license to be shipped to Russia, which none of **HORVATH**, U.S. PERSON 1, or any other individual or entity associated with the transaction applied for or possessed.

## CONCLUSION

50. Based on facts described above, there is probable cause to believe that **Bence HORVATH** and co-conspirators known and unknown have conspired to violate 50 U.S.C. § 4819.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

51. I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for an Arrest Warrant. I submit that Assistant U.S. Attorney Maeghan Mikorski, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

Respectfully submitted,

Rory P. Marquette
Special Agent
Homeland Security Investigations

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 on August 23, 2024

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE